### GEORGE v. CYPRESS HILLS CEMETERY.

(Supreme Court, Appellate Division, Second Department.    July 11, 1898.)

CEMETERY ASSOCIATION—NEGLECT OF GRAVES.

In an action against a cemetery corporation to recover damages for personal injuries due to the alleged negligence of the defendant in allowing poison ivy to grow upon the grave of the plaintiff's husband, so that she was poisoned thereby, it appeared that the grave was in the so-called "public ground," where the defendant only mowed and cleaned up the whole ground once or twice a season, as occasion required, and that it was not paid to give special care to the grave. There was no evidence that the ivy in question had been growing there for any substantial time prior to plaintiff's injury, or that it had been growing elsewhere in that part of the cemetery, or that the defendant had any actual notice of its presence. *Held*, that the evidence did not support a finding of the absence of reasonable care, for which alone the defendant would be liable.

Woodward, and Hatch, JJ., dissenting.

Appeal from trial term, Kings county.

Action by Barbara E. George against the Cypress Hills Cemetery. From a judgment in favor of plaintiff, and from an order denying a new trial, defendant appeals. Reversed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and WOODWARD, JJ.

Joseph A. Burr, for appellant.

Almet F. Jenks, for respondent.

WILLARD BARTLETT, J. By the verdict in this case the defendant corporation has been held to be chargeable with negligence in allowing poison ivy to grow upon the grave of the plaintiff's husband, in Cypress Hills Cemetery, so that the plaintiff was severely poisoned by such ivy in June, 1895, while she was engaged about the grave in planting flowers. The evidence that the plaintiff's sufferings were actually caused by ivy poisoning was rather meager. The physician whom she consulted at the time testified that he treated her but once for the trouble of which she complained, which was an inflammation of the skin, and that, while whatever he told her was right, he had no recollection at the trial in regard to what he did say to her. He presumed he prescribed the usual remedies for poison ivy, but could not tell what he prescribed. The case, he said, did not attract much attention on his part. "I remember Mrs. George coming into my office one summer morning with her face considerably swollen," he testified, "and that is all that I recall. It was swollen, reddened, and sensitive, to the extent of all skin inflammations to produce that state of affairs. It might be attributable to ivy poison." This is supplemented by the testimony of the plaintiff herself that the doctor told her she was poisoned with ivy; and, in view of the fact that poison ivy was found growing on her husband's grave two months later, I am inclined to think that there is enough in the record to sustain the finding of the jury in this respect, though I should be much better satisfied if the proof was stronger on this branch of the case.

The grave of the plaintiff's husband is situated in a part of Cypress Hills Cemetery known as "Locust Grove." The superintendent describes it as the "public ground," in which persons buy graves for $12 each. According to his testimony, "the cemetery does not own the soil, but the purchasers buy the graves out and out, and they have jurisdiction themselves over the grave." In this view of the legal relation of the parties, the witness was in error, as it appears that the plaintiff received a mere ticket of interment. The position of the plaintiff, as the purchaser of the grave, was analogous to that of the owner of a church pew. Buffalo City Cemetery v. City of Buffalo, 46 N. Y. 503. She had acquired the right to use it for a certain purpose, and the right of access to it, under such rules and regulations as the corporation was empowered by law to establish. Among other things, the statute authorizes such a corporation as the defendant "to regulate the introduction and growth of plants, trees and shrubs, within the cemetery grounds." Laws 1874, c. 245, § 4. In the so-called "public ground," where this grave was, the corporation only mows and cleans

up "the whole ground all over, including the ground between the graves," once or twice a season, as occasion requires; and nothing more is done there, except to particular graves, which the association is especially paid to care for.

Having regard to the control which the law gave to the corporation, and which it actually exerted within the limits of the cemetery, I think its officers and agents were bound to exercise reasonable care not to permit the introduction into the lots, or upon or about the graves, of anything which they knew, or ought to have known, would constitute an unusual source of danger to persons lawfully visiting such lots or graves. Whether poison ivy comes within this class of perils may be doubted; but, assuming that it does, I am unable to agree with the conclusion reached by Mr. Justice WOODWARD, that the proof in the present case is sufficient to establish a failure on the part of the corporation to fulfill its legal obligation in respect to it. I question very much whether the courts can take judicial notice of the dangerous properties of poison ivy. There does not seem to be entire harmony of view among botanical authorities in regard to the liability of persons to be injuriously affected by it. The fact is tolerably familiar that it is extremely poisonous to some persons, and wholly harmless to others, but what proportion of those who touch it are thereby poisoned does not appear to be even approximately known. Where the facts are so indefinitely ascertained, the courts can hardly take judicial notice of a matter, but must act upon the proof with regard to it in each particular case. Assuming, however, that the defendant's representatives in the management of the cemetery knew that poison ivy was likely to be harmful to a considerable proportion of the persons who might be unfortunate enough to touch it, the extent of their duty, as it seems to me, was measured by the obligation to exercise reasonable care to prevent the presence of the plant about or among the graves. The corporation certainly was not an insurer against its appearance in places where it might do injury. The association was only bound to do what an ordinarily prudent person would do to avert danger from this source. There is no suggestion that the corporation was cultivating poison ivy in the cemetery. There is no evidence of actual notice to the association that poison ivy was growing on the grave of the plaintiff's husband, until after the visit at which she says she was poisoned. Nor do I think that the proof is sufficiently strong to charge the defendant with constructive notice that it was there. The superintendent admitted that there was some poison ivy in the unimproved part of the cemetery, but that appears to be a wholly different locality, where it could do no harm to visitors. Another witness said he had been poisoned by poison ivy in this same cemetery in 1891, at a spot which he designated as "Lot 232 on Stony Path"; but there is nothing to show that this is in the same part of the grounds as the grave of the plaintiff's husband, or anywhere near it. In August, 1895, two months after the alleged poisoning of the plaintiff, a florist visited her husband's grave at the instance of her attorney, and he testified that he found poison ivy on and about the grave. "It ran on the grave from the walk way," he said. "It would probably take two or three months to have the growth

that I saw it have on the grave." This witness could not express an opinion that the ivy which he found there might not have grown since June. So that there really is no proof in the case from which it can fairly be inferred that the ivy which poisoned the plaintiff had been there long enough to justify us in holding that the association, in the exercise of reasonable care, was bound to know of its presence in that part of the cemetery. I am of the opinion, therefore, that no liability should be imputed to the defendant upon the facts disclosed by this record. I concur fully, however, with the conclusion of Mr. Justice WOODWARD that the defendant cannot be held exempt from responsibility for the negligence of its agents and servants on the ground that it is a charitable corporation, and in the reasoning by which he reaches that result. The difficulty that I find with the judgment here is that the defendant is not shown to have violated the rule of reasonable care, which I think is all the law imposed upon it. The courts should be extremely cautious, it seems to me, not to lay down any new rule, or enlarge any old one, so as to extend the liability of those who own or control land, for the presence of poisonous plants upon their property. So far as I know, poison ivy (rhus toxicodendron) and poison sumach (rhus venenata) are the only common plants in the Eastern United States which are poisonous to the touch. Poison sumach grows chiefly in swampy places, where its inaccessibility prevents persons from approaching it with anything like the frequency with which they may encounter poison ivy. The latter is one of the commonest forms of vegetation to be met with in this part of the state. It abounds in the Second judicial district, and in Rockland county, in the autumn, the stone walls for miles in the country around the court house are clothed with poison ivy, and to some extent beautified by the colors of the foliage. The plant may be found along the roadside in nearly all the rural parts of the Greater New York. If the traveler on the highway is to have a right of action against the municipality because it leaves this shrub there to poison his legs, or an action against the farmer for allowing poison ivy to grow on a wall which the wayfarer leans against in taking his noonday rest, a novel and interesting, not to say onerous, class of negligence suits will speedily be developed. I am in favor of a reversal of this judgment.

CULLEN, J., concurs.

WOODWARD, J. (dissenting). The husband of the plaintiff in this action died in 1891, and was buried in what is known as the "public ground" of the defendant; the plaintiff purchasing the right to make such interment. In the month of June, 1895, after an absence from the grave of something like two years, due to the illness of a daughter, and other demands upon her time, the plaintiff visited the cemetery of the defendant; making some improvements upon the grave of her late husband, and planting thereon certain flowers and shrubs. In doing this, she was obliged to remove a growth of weeds, etc., which had accumulated upon the grave. Soon after doing this work, and while on her way home, she experienced irritating

pains in her fingers, along her arm, and upon her side and neck. These growing worse, she visited a physician, and was told that she was suffering from poison-ivy poisoning. She was treated for this for a period of more than one year, and at the time of the trial of this action she continued to suffer from the effect of this poisoning, causing her to lose much time from her usual vocations. The evidence produced upon the trial tended to establish the fact that this poisoning was received while the plaintiff was engaged in decorating the grave of her late husband, that it resulted from contact with poison ivy, and that the defendant had notice of the actual presence of this poisonous vine within the cemetery, if not at this particular point. It was established that the plant is of a comparatively slow growth, creeping over large spaces, and that, within a few weeks of the time that the plaintiff planted the flowers, leaves of the poison ivy were found upon the grave of the deceased; indicating that the roots had not been destroyed, and that the plant must have been there at the time that the plaintiff visited the grave. This action is brought to recover damages for the alleged neglect of the defendant in allowing this poisonous weed to grow in and along the pathways, and over the grave of the deceased, by reason of which the plaintiff suffered the injury above set forth.

It is contended on the part of the plaintiff that the defendant, in accepting her money for the price of the burial lot, and in constructing walks, drives, etc., and in throwing the grounds open to the public, invited her to enter, and that while so within the grounds for a lawful purpose the defendant was under obligations to see that she was not injured by reason of its own negligence. "When the owner of land, expressly or by implication, invites a person to come upon his land," say the court in the case of Beck v. Carter, 68 N. Y., at page 292, "he cannot permit anything in the nature of a snare to exist thereon, which results in injury to the person who avails himself of the invitation, and who at the time is exercising ordinary care, without being answerable for the consequences"; and this is undoubtedly the rule of law, in so far as this aspect of the case is concerned. The plaintiff being upon the grounds of the defendant, by its invitation, for a lawful purpose, she had a right to assume that all of the steps necessary to insure her reasonable safety had been taken by the defendant; and she was not bound to know that the weeds which she found upon the grave of her late husband were poisonous to the touch, and a menace to her health. It is urged, however, that, as the plot in which this grave was made belonged to the plaintiff, it was her duty to care for and remove this poisonous weed or plant, and that a failure on her part to do so constituted contributory negligence. While this would be true, were she the owner in fee simple of the property, the case is presented in a different light when we consider the nature of the property which the plaintiff has in this plot. It is provided by section 4 of chapter 245 of the Laws of 1874, amending the act under which this defendant is incorporated, that such associations shall have power to "regulate the introduction and growth of plants, trees and shrubs within the cemetery grounds. Such rules and regulations,

when adopted, shall be binding upon all lot owners and persons visit--
ing said cemetery grounds, and shall apply to all lots and parts of
lots sold or hereafter to be sold." The association, therefore, is-
in control of the grounds. It may "regulate the introduction and
growth of plants, trees and shrubs within the cemetery grounds";.
and, having this power, it cannot escape the responsibility incident
to that power. "As far as we can gather from the printed papers.
before us," say the court in the case of Buffalo City Cemetery
v. City of Buffalo, 46 N. Y. 503, in discussing a similar corporation,.
"the owners, other than the appellant here indicated, are the persons·
to whom, respectively, subdivisions of the whole tract of the appel-
lant's land have been by it conveyed, to be held and used by them
for burial purposes. The effect of such conveyance, under the stat-
ute from which the plaintiff derives its powers, is, we suppose, no·
more than to confer upon the holder of a lot a right to use for the·
purpose of interments. No such estate is granted as makes him an
owner in such sense as to exclude the general proprietorship of the·
association. The association remains the owner in general, and·
holds that relation to the public and to the government, while, sub-
ject to this, the individual has a right, exclusive of any other person,.
to bury upon the subdivided plat assigned to him. He holds a posi-
tion analogous to that of a pew holder in a house for public worship."
It would hardly be held that a pew holder in a house for public wor--
ship was responsible for the condition of the pew, and it cannot be·
that the plaintiff in this action was in any wise charged with the
duty of keeping the grave of her late husband free from a poisonous·
weed or plant.

There were facts enough before the jury to justify the finding·
that the plaintiff came in contact with the poison ivy while engaged·
in lawfully decorating the grave of her late husband; that the poison·
ivy had been allowed to grow in the pathways, and over the grave..
But the evidence of the character of the plant is not as strong as·
might be desired, and it becomes necessary to consider whether poi-
son ivy is of such a dangerous character that the court will be justi-
fied in taking judicial notice of its poisonous nature. It will be·
conceded that if the cemetery association permitted the development
of a den of rattlesnakes upon its premises, with notice of the fact,
it would be liable for any damage which might result from the pres-
ence of these reptiles; the court would take judicial notice of the·
fact that rattlesnakes are poisonous, and would hold the association·
which invited people to its grounds liable for the negligent main-
tenance of these snakes. Is there any difference, except in the de-
gree of poisoning, between a poisonous vine trailing over the ground,
menacing those who approach it, and a poisonous snake? Is the·
knowledge of the dangerous character of the one any better authen-
ticated, or any more general, than the other? We find no cases.
which have passed upon this question, but a careful examination of
encyclopedias, dictionaries, popular and scientific medical works, pub--
lished at widely different dates and places, indicates clearly that
the plant commonly known as "poison ivy" is inimical to the health
of those who become tainted with its poison, and that its character·

is so generally understood as to bring it within the common knowledge of those within the jurisdiction of this court.   The consensus of the authorities examined may be properly summed up in the language of V. K. Chesnut, assistant in the division of botany, United States department of agriculture, who says at page 139 of the Yearbook of the Department of Agriculture for 1896, in his article on "Some Common Poisonous Plants":

"Perhaps no plant is more popularly recognized as harmful than the poison ivy.   Its effects upon the human skin are familiar to every one, and, as its victims far outnumber those of all other species combined, it has come to be regarded as the principal poisonous plant of America."

Again he says, at page 141:

"Poison ivy being so great a public nuisance, it is strange that no legal measures have ever been carried out to suppress its growth.   Municipalities protect their people against diseased food, by the appointment of inspection agents; and farming communities defend themselves against the ravages of animals, by bounties.   Why should not this plant in some way be provided against, especially now that its poisonous nature and its antidote are so exactly known?   Much would be accomplished if the owners of suburban places of popular resort were compelled to weed out the vine from their premises. The regulation might also be made to cover its destruction along the country roadsides."

Dr. Franz Pfaff, of Harvard University, has recently made some interesting discoveries in relation to this plant, and has finally demonstrated that the poison is a nonvolatile oil, and that it is found in all parts of the plant,—even in the wood when long dried; and the fact of its poisonous nature, operating unequally, perhaps, but nevertheless generally, is fully recognized.

In the only cases bearing close analogy to the one at bar, the courts seem to have accepted the general knowledge of the jurisdiction upon questions of this character.   In the case of Crowhurst v. Burial Board, 4 Exch. Div. 5, reported in full in 18 Alb. Law J. 514, where the cemetery association had planted yew trees in such a manner that they overhung the grounds of a neighbor, whose horse browsed the tree, and was killed by eating the leaves, it was held that the cemetery was responsible for the death of the horse.   In discussing this case the court say:

"The principle by which such a case is to be governed is carefully expressed in the judgment of the Exchequer Chamber in Fletcher v. Rylands, 14 Wkly. Rep. 799, at page 801, L. R. 1 Exch. 265, at page 279, where it is said, 'We think that the rule of law is that the person who, for his own purposes, brings on his lands, and collects and keeps there, anything likely to do mischief if it escapes, must keep it in at his peril, and, if he does not do so, is prima facie liable for all the damage which is the natural consequence of its escape.'   This statement of the law was cited and approved of in the judgment of the house of lords in the same case."

Continuing, in the same case, the court say:

"It does not appear from the case what evidence was given in the county court to prove either that the defendants knew that yew trees were poisonous to cattle, or that the fact was common knowledge amongst persons who have to do with cattle.   As to the defendants' knowledge, it would be immaterial, as, whether they knew it or not, they must be held responsible for the natural consequences of their own act.   It is, however, distinctly found by the judge,. 'The fact that cattle frequently browse on the leaves and branches of yew

trees when within reach, and not unfrequently are poisoned thereby, is generally known;' and by this finding, which certainly is in accordance with experience, we are bound."

In the case of Lambert v. Bessey, T. Raym. 421, cited in support of the above, the defendant pleaded that he had land adjoining the plaintiff's close, and upon it a hedge of thorns; that he cut the thorns, and that they, ipso invito, fell upon the plaintiff's land, and the defendant took them off as soon as he could. On demurrer, judgment was given for the plaintiff, on the ground that, though a man do a lawful thing, yet, if any damage thereby befalls another, he shall be answerable, if he could have avoided it.

In the case of Wilson v. Newberry, L. R. 7 Q. B. 31, where the defendant was possessed of yew trees, the clippings of which he knew to be poisonous, and which were allowed to reach the lands of the plaintiff, whose horse ate of them and was killed, the court did not question the right of the plaintiff to recover, but on demurrer held that the declaration was not sufficient to show that the defendant was responsible for the presence of the clippings upon the premises of the plaintiff. The court say:

"I am of opinion that this declaration is bad. The duty alleged does not result from the facts stated. The facts upon which this duty is said to be founded are these: The defendant was possessed of certain yew trees, then being in and upon certain lands of the defendant, in his occupation, the clippings off which yew trees were, to the knowledge of the defendant, poisonous. These are the only facts from which the duty charged is to be inferred. * * * Now, it is not alleged that the defendant clipped the yew trees. it is not alleged that he knew the yew trees were clipped, and it is not alleged that he had anything to do with the escape of the yew clippings onto his neighbor's land. It is quite consistent with the averments of this declaration that the cutting may have been done by a stranger without the defendant's knowledge. I cannot think that the duty charged can be deduced from the facts stated, and therefore, in my opinion, the declaration is bad."

In the case of Gibbs v. Coykendall, 39 Hun, 140, the plaintiff hired defendant to pasture cattle on his farm, and they there fell sick and died of Texan fever, which they contracted from the dejections of Texan cattle previously pastured there. The plaintiff did not know of the previous pasturing, and the defendant did not know of the danger of contracting this disease. It was held in this case that the defendant was not liable, because he had been guilty of no negligence. Justice Haight, in delivering the opinion of the court, says:

"An agister of cattle is a bailee for hire, and as such is bound to use ordinary diligence properly to care for and protect the cattle placed in his charge, and is responsible for loss occasioned by his negligence. * * * But he is not an insurer of the property, and unless he is guilty of negligence he would not be liable for injuries that may be suffered through other causes, and over which he has no control. * * * Again, it is claimed that he ought to have known of the deleterious influences that such cattle would create. It is true that like trouble had been occasioned in several of the Western states, and to some extent in this state; that it had been the subject of investigation by the government, and in some of the states laws had been passed prohibiting the pasturing of Texan cattle. But the liability of native cattle to contract the disease from Texan cattle was but little known or understood in this state. It was not a matter of such public notoriety among our farmers as would justify the court in charging, as a matter of law, that the defendant was bound to have known it."

The court clearly intimates that if the fact of this disease being contagious was generally known to the farming community of this state, as is the dangerous character of poison ivy to the community in general, there would be justification for charging, as a matter of law, that the defendant was bound to know the danger to which he was exposing the cattle of the plaintiff, and of this there is no reason to doubt.

In the case of Smith v. Baker, 20 Fed. 709, where the defendant had taken her children, who had the whooping cough, into the house of the plaintiff, who kept boarders, thus spreading the disease and causing the plaintiff trouble and expense, it was held that the defendant was liable for damages. Discussing the case, the court say:

"A person sustaining an injury not common to others, by a nuisance, is entitled to an action. Co. Litt. 56a. Negligently imparting such a disease to a person is clearly as great an injury as to impute the having it, and negligently affecting the health of persons injuriously as great a wrong as so affecting that of animals."

Section 70 of the highway law—1 Rev. St. (Banks & Bros.' 9th Ed.) p. 692—makes it the duty of every person or corporation owning or occupying real estate abutting on a highway to destroy the noxious weeds within the highway twice during the summer; and no person is to be permitted to place any such noxious weeds, or the seeds of the same, within the highway. Other sections provide that supervisors, overseers of highways, railroad and canal corporations, shall have power, and shall be obliged, to remove such weeds; and while this does not mention poison ivy, in words, nor impose a special duty upon the cemetery association in so far as the interior of its grounds is concerned, it does indicate the policy of the state in respect to noxious plants; and it imposes upon the cemetery corporation, in common with others, the duty of seeing that poison ivy does not intrude upon the highways from within its inclosures, and thus imposes the responsibility of knowing of its existence upon the premises of such corporation. It was in evidence in the case at bar that "the books report that people can be poisoned by this ivy by exhalation, as well as by contact with it." This was admitted without exception, and was not disputed by any evidence offered on the part of the defendant. Again, the plaintiff testifies, without exception, that the doctor whom she employed told her that "I was poisoned with ivy." Charles E. French testifies that he was poisoned by poison ivy in this same cemetery on Decoration Day in 1891, and this was admitted without exception. Taking this evidence in connection with the common knowledge of the people of this state of the poisonous nature of this plant, we are satisfied that the jury was justified in finding that the Cypress Hills Cemetery was negligent in allowing it to creep over the grave of the plaintiff's husband, where she came in contact with it while lawfully upon the premises of the cemetery corporation, by its invitation.

It is urged, however, that "the defendant, being a rural cemetery corporation organized under the act of 1847, and not a stock corporation carrying on business for the purpose of profit, is not responsible

52 N.Y.S.—70

for the negligent acts of its employés, and for this reason this action
will not lie." In support of this proposition, which, in so far as we
are able to discover, is entirely new to the jurisprudence of this
state, we are cited to numerous cases in this and other states where
the courts, in dealing with charitable trusts for hospitals, etc., have
refused to allow the trust funds to be depleted in paying judgments
for the torts of servants or employés; and the effort is made to es-
tablish an analogy between these cases and the case at bar. It is
interesting, therefore, to consider the question, and to determine how
far a cemetery corporation is such a public charity as to entitle it
to exemption from its duties to those who are within its grounds
upon lawful errands, and by its invitation. The defendant corpora-
tion was organized under the provisions of chapter 133 of the Laws
of 1847. This act, after providing for the organization of rural cem-
etery associations by the election of officers, etc., and the purchase of
real estate for the purposes of the association, enacts that:

"After the payment of the purchase money and the debts contracted there-
for, and for surveying and laying out the land, the proceeds of all future
sales shall be applied to the improvement, embellishment and preservation
of such cemetery, and for incidental expenses, and to no other purpose or
object."

The association is also authorized, by section 9 of the act, to—

"Take and hold any property, real or personal, bequeathed or given in trust,
to apply the income thereof under the direction of the board of trustees of
such association, for the improvement and embellishment of such cemetery,
or the erection or preservation of any buildings, structures, fences or
walks, erected or to be erected on the lands of any such cemetery association,
or upon the lots or plats of any of the proprietors; or for the repair, preser-
vation, erection or renewal of any tomb, monument, grave stone, fence, railing,
or other erection, in or around any cemetery lot, or plat; or for planting and
cultivating trees, shrubs, flowers or plants, in or around any such lot or plat,
or for improving or embellishing such cemetery, or any of the lots or plats
in any other manner or form; consistent with the design and purposes of
the association according to the terms of such grant, devise or bequest."

The next section provides for exempting such cemetery lands and
property from all public taxation, and such lands and property
shall not be liable to—

"Be sold on execution, or be applied in payment of debts, due from any indi-
vidual proprietors. But the proprietors of lots or plats in such cemeteries,
their heirs or devisees, may hold the same exempt therefrom so long as the
same shall remain dedicated to the purposes of a cemetery, and during that
time no street, road, avenue or thoroughfare shall be laid through such cem-
etery," etc.

This act was amended in 1852 and 1853, but without making any
changes in so far as these provisions are concerned. In 1874 the
act was again amended, allowing the sale of lots by individual own-
ers whenever the bodies of deceased persons should be removed, on
application to the court for an order allowing such sale, and giving
the cemetery association full power to govern the planting of trees,
flowers, and shrubs. In 1877 the act was once more amended, so
that the funds held in trust under the provisions of section 9 should
also be exempt from taxation, and from liability to sale on execu-
tion for the debts due from any individual proprietor. In 1879 an-
other amendment was made to this law, and it was provided that:

"No land actually used and occupied for cemetery purposes shall be sold under execution or for any tax or assessment, nor shall any such tax or assessment be levied, collected, or imposed, nor shall it be lawful to mortgage such land, or to apply it in payment of debts, so long as it shall continue to be used for such cemetery purposes."

"Sec. 2. Whenever any such land shall cease to be used for cemetery purposes, any judgment, tax or assessment which, but for the provisions of this act, would have been levied, collected or imposed, shall thereupon, forthwith, together with interest thereon, become and be a lien and charge upon such land, and collectible out of the same."

This last amendment, passed subsequent to the decision of the court in the case of Buffalo City Cemetery v. City of Buffalo, 46 N. Y. 506, was undoubtedly enacted to change the rule of law in respect to the mortgage or sale of the cemetery property as a whole. In that case the court say:

"However repugnant to proper sentiment it may be to have such property the subject of sale by process, it is for the legislature to say how far that sentiment shall be regarded, and it is for the court to interpret and apply the language used to that end. Apt words are used in this enactment to preserve the property from sale, on execution or voluntary application, for the payment of the debts of an associate, and from being alienated by him. If there are not words whose established meaning exempts from the usual municipal assessments, a new meaning cannot be given to those employed; and it must be inferred that it was not contemplated that the association would be endangered by such assessments, made as they generally are, and resulting as they sometimes do, for the benefit of the property."

There can be no doubt that up to the time of the passage of the amendment of 1879 all of the property of a rural cemetery association was liable for judgments or assessments for special city improvements,—this being the question involved in the case above cited,—and the act of 1879 exempted from execution and sale only the land of such cemetery associations while they should be actually used for cemetery purposes, without giving such an exemption to the personal property; and it is safe to say that any proper judgment may therefore be collected against such an association, provided it has personal property or an income sufficient to meet such demands. We come, then, to the question of liability,—whether a rural cemetery association is such a charitable association that its property may be said to be held in trust for a charitable purpose to an extent which will exempt it from responsibility for the torts or the neglects of its employés. "The charge of the funeral expenses affects all of the goods of the deceased," says Domat's Civil Law, by Stranahan (2 Cush. Ed.) 2654, "as much as if the person who furnishes the things necessary had contracted for them with the deceased himself. And he has, moreover, a privilege on the said goods, as has been mentioned in the fourteenth article of the fifth section of Pawns and Mortgages." This was the civil law, and it is now the law of this state. "It is now proposed to consider the duties of an executor or administrator," says Williams, Ex'rs, *835. "And first he must bury the deceased in a manner suitable to the estate he leaves behind him. Funeral expenses, says Lord Coke, according to the degree and quality of the deceased, are to be allowed of the goods of the deceased, before any debt or duty whatsoever." "Though our statute of payment of debts and legacies gives the order in which the

executor shall make payment of debts against the estate," say the court in the case of Patterson v. Patterson, 59 N. Y. 574, "and though there is no provision there for a priority of payment of funeral expenses, it is not to be held therefrom that the common-law rule is abrogated. Those expenses are not to be treated as a debt against the estate, but as a charge upon the estate, the same as the necessary expenses of administration." See, also, Pettengill v. Abbott, 167 Mass. 307, 45 N. E. 748, where the court holds that a reasonable amount expended in the procurement of a burial place is a necessary part of the funeral expenses. It being the duty of the estate of each individual to provide for interment where the estate is solvent, there does not seem to be any principle of charity involved in a cemetery association. It is not organized for the purpose of providing a burial place for those who die insolvent, but to enable individuals in their lifetime to provide a suitable place in which they may be interred, or for the interment of their relatives and friends, upon the payment of a reasonable compensation. A rural cemetery association, organized under the Laws of 1847, so far from being a charitable institution, is a mere co-operative association for the purpose of providing and maintaining a burial place with the least possible cost to the individual, and is as strictly a business transaction, dictated by business principles, as any other enterprise in which the individual may be engaged. From the promulgation of the Duke of York's laws at Hempstead, L. I., in 1665, there has been a disposition in this state to foster public burials, based upon considerations of public policy; and this has prompted legislative bodies from time to time to make laws compelling such burials in the earlier stages, and latterly to encourage them by exempting from taxation, etc., the property set aside for the purpose of burials. This has brought about a condition where the individual may relieve his estate of the burden of furnishing an independent or private grave, and by investing in company with others he may not only secure a respectable burial place, but he may insure its being kept in a decent condition at a much less expense to himself and to his estate than would otherwise be possible. It is simply an economical, business-like way of providing the burial place which the law compels the estate of the individual to provide, and is entirely distinct from any of the elements of charity. "The substantial right of enjoyment of the property is vested in the individual lot owners," say the court in Re Deansville Cemetery Ass'n, 66 N. Y. 569, "and the whole effect of the incorporation of these cemetery associations is to enable a number of private individuals to unite in purchasing property for their own use and that of their descendants as a place of burial, and to secure a permanent management of it, through the instrumentality of trustees appointed by themselves, and subject to no other control, with the privilege, when they cease to use their lots as a place of burial, to sell them and receive the proceeds for their own benefit."

Even in the matter of sustaining wills, the courts have not been willing to look upon trusts for the keeping of graves in repair with favor; and they have been declared void in almost every in-

stance, except in such cases as the trust was made to a religious society which maintained the graves of its dead as a part of its religious duty. In the case of Dexter v. Gardner, 7 Allen, 243, this distinction was made. The evidence showed that the will of the testator provided for a gift for the benefit of the Society of Friends; and it was urged that one of the uses to which this society put its funds was the purchase and care of cemeteries, which is not a charitable use, within the statute, and is therefore not within the exception to the law against perpetuities. The court, in considering this question, say:

"But the language of the will in this case is no more comprehensive than that of the deed in the case of Earle v. Wood [8 Cush. 430]. The trust there expressed was, 'to and for the uses and purposes of the said people called "Quakers," as by the said yearly, quarterly, or monthly meeting, or their, or either of their, committees, may be devised, advised, and required.' That trust was held valid as a charity within the statute; and, if it be so, a trust 'for the benefit of the Friends' Meeting in Fairhaven and Rochester' is unquestionably valid. The trust in that case would include appropriations for burying grounds, as well as in this case. And where a denomination of Christians regard the providing and oversight of burying grounds as a religious duty accompanying burials of the dead with religious services, as is usual among most sects of Christians here, it is difficult to see by what principle this religious duty can be distinguished from that of maintaining and repairing meeting houses, in respect to the statute."

"The question before us," say the court in the case of Kelly v. Nichols (R. I.) 21 Atl. 907, and 25 Atl. 840, "is whether the testamentary gift is valid as a gift to charitable uses. This question can only be determined by the purposes for which the gift is made, as disclosed in the will. The first designated purpose is the care of the graves. Among all classes there is a prevailing sentiment of reverence for the burial places of the dead, which springs naturally from the Christian belief in the resurrection of the body. This sentiment is recognized in this state and elsewhere by the creation of corporations for maintaining and adorning cemeteries, and by statutes which allow town councils to receive and hold funds in trust for the care of burial lots. However general and commendable this sentiment may be, and however desirable it may be that the graves of the dead be decently and reverently cared for, nevertheless we do not think a bequest of this kind falls within the limits of a charitable use. It is not a gift in aid of any public object, nor for a purpose which affects the public in any way. It benefits no one. Its purpose is purely private and personal. It seeks to create a perpetuity simply to insure the care of the testator's own burial lot. It does not run to a corporation created for this special purpose, or authorized by its charter to receive such gifts, but to trustees in perpetuity. It is now well settled in England that such bequests are void." This case was decided in the supreme court of Rhode Island, and is in line with the case of Johnson v. Holifield, 79 Ala. 423, where it was held that "a bequest of money to county commissioners, 'and their successors in office, or to such authority as may control and direct the finances of said county, to be held in perpetuity in trust,' and the interest to be expended annually in the repair, preservation, and neat-keeping of the graves and monuments of the testatrix and other named relatives, is not a bequest to a char-

itable use, within the exception to the rule against perpetuities, and
is void." "No distinction," say the court in the case of Bates v. Bates,
134 Mass., at page 114, "between these cases and that at bar can be
made, favorable to the latter. The repair of a private monumental
structure is a matter strictly individual and personal. The fund con-
stituted by the testatrix is to be expended for her own gratification,
upon an object in which the public has no interest, and which has
no proper similitude to a charitable use. 'It stands,' as the master of
the rolls remarks in Mellick v. Asylum [Jac. 180] ubi supra, 'on the
same footing as an expensive funeral.'"

It is clear, then, that the moneys which the defendant corporation
has or may receive from individual lot owners, and which it holds for
the purpose of making improvements in the cemetery, are not held for
a charitable use, as understood by Lord Camden, who declared a chari-
table use to be a "gift to a general public use, which extends to the
poor as well as the rich," or within the rules laid down by our
courts. This being true, and these cemetery associations being organ-
ized for purely business considerations, it is difficult to see why they
should be given any greater consideration than any other corporation
organized for the purpose of promoting private ends. In Massachu-
setts, where the fire underwriters of the city of Boston were incorpo-
rated for the purpose of protecting goods exposed during fires, and
where they afforded this protection alike to insured and uninsured
goods, without receiving any compensation except through the assess-
ments levied pro rata upon the insurance companies, the court, in the
case of Newcomb v. Protective Department, 151 Mass. 215, 24 N. E.
39, held that this was not a charitable corporation. "Upon these
facts," say the court, "is the defendant a public charitable organiza-
tion, or is it a private corporation carrying on business for the pe-
cuniary benefit of its members, and incidentally helping others be-
cause it is impracticable to conduct its business without so doing?
Clearly it is a private, and not a public, corporation. It seems to us,
also, that it was not organized, and is not conducted, as a public char-
ity, but to diminish the cost of fire insurance to underwriters." This
corporation, like the cemetery associations, had no capital stock, it
paid no dividends, and the benefits derived were indirect, but the court
holds that it is not a charitable organization; and it is equally certain
that a cemetery corporation is not charitable, but a mere business
concern for the sake of reducing the cost of burial to the individual
and his descendants." In the case of Haas v. Society, 6 Misc. Rep.
281, 26 N. Y. Supp. 868, relied upon by the defendant as an authority
in support of his contention that the cemetery association is not an-
swerable for its neglect in the case at bar, the action was dismissed
because of the fact that the court held that the defendant, being a
religious and charitable institution, holding in trust its funds for re-
ligious and charitable purposes, could not be called to answer for the
negligence or torts of its employés. The leading case upon this ques-
tion seems to be McDonald v. Hospital, 120 Mass. 432, and the court
say:

"The ground upon which the plaintiff seeks to maintain this action is that
the defendant undertook, through its agents and servants, to treat his broken

.leg, and that this was done so negligently and unskillfully that he was permanently injured. * * * We are satisfied that, for other reasons, the plaintiff is not entitled to recover upon the case made by him. The defendant was a public charitable institution under the laws of the commonwealth. The object for which it was incorporated was to provide a general hospital for sick and insane persons. Its funds are derived from grants and donations made by the commonwealth from profits which it is entitled to receive from the Massachusetts Hospital Life Insurance Company, and other companies incorporated in the commonwealth, and from the grants, devises, donations, bequests, and subscriptions of benevolent persons, and from the board of paying patients. * * * The corporation had no capital stock, no provision for making dividends or profits, and whatever it may receive from any source it holds in trust to be devoted to the object of sustaining the hospital, and increasing its benefit to the public, by extending or improving its accommodations and diminishing its expenses. Its funds are derived mainly from public and private charity. Its affairs are conducted for a great public purpose,—that of administering to the comfort of the sick, without any expectation, on the part of those immediately interested in the corporation, of receiving any compensation which will inure to their own benefit, and without .any right to receive such compensation. This establishes its character as a public charity. * * * It has no funds which can be charged with any judgment which he might recover, except those which are held subject to the trust .of maintaining the hospital."

This, it will be observed, presents the case in a very different light from that of a cemetery association organized to promote the inter-·ests of the individual members. The courts, in the case of a public charity, refuse to allow trust funds to be reached to pay judgments in favor of persons who may have suffered wrongs at the hands of the agents or servants of the charitable corporation, upon the theory .that these institutions are discharging a function belonging to government, and any diversion of the trust funds to purposes outside ·of the object for which they were granted would tend to destroy the charity, and to throw the burden upon the government. There is no such consideration of public policy involved in the maintenance ·of a cemetery. Each individual, his estate, or his immediate relatives or friends, is obliged to provide for his own interment. No amount of hardship which a cemetery association might suffer would change this condition, or prevent the interment of each in his turn; .and there is therefore no question of public policy involved, and the ·contention of the defendant in this action is without force.

A case, the facts of which are closely allied to the one at bar, was .decided by the supreme judicial court of Massachusetts in February, 1888; and, in the absence of any adjudication in this state, it would .seem to be entitled to controlling weight, even though the reasoning in the case at bar were much less clear. Donnelly v. Association, 146 Mass. 163, 15 N. E. 505. That case was one of tort, by reason of ·the neglect of a cemetery association organized under a statute which, for the purposes of this discussion, was almost identical with our ·own. The facts, as stated by the trial court for the purposes of review, were as follows:

"It appeared that the defendant was specially incorporated by St. 1851, c. ·292, 'for the purpose of establishing and perpetuating a place for the burial .of the dead,' subject to St. 1841, c. 114, and by subsequent legislation was authorized to hold real and personal estate for the purposes for which it was ·established, to the amount of $132,500; that it had no capital stock, issued no ·certificates of shares, and paid no dividends, or any profits; that no member

of the corporation, by virtue of his membership, received any pecuniary benefit whatever from the association; that all of the money received by the corporation, whether from the sale of graves or otherwise, was exclusively used for ornamenting the grounds, burying the poor, giving graves to public institutions, and carrying out the purposes for which the corporation was formed; that, when persons died without leaving sufficient funds for burial, the corporation gave graves, and furnished the coffin and hearse, and in case of the death of any of the inmates of public and charitable institutions the graves were, upon application, furnished for nothing; and that this had been the character and course of the association from its organization. The plaintiff in 1878 purchased a grave from the defendant for seven dollars, the deed of which entitled him and his heirs and assigns to the grave as a place of burial, and contained the following conditions: 'That said lot shall not be transferred without the consent of the trustees; shall be subject to the regulations made or to be made in the care and management of said cemetery by the trustees, who shall also have the right to prevent the erection of any offensive or improper monument or inscription thereon, and shall retain the right to enter any lot or lots for the removal of anything objectionable; that no remains shall be deposited therein for hire; and that persons dying in drunkenness, duel, or by self-destruction, unbaptized, non-Catholics, or otherwise opposed to the Catholic Church, shall not be there interred.' The plaintiff had successively buried his father and one of his children in this grave, and in March, 1884, brought the remains of his wife for interment in the same grave. Upon the arrival of the funeral procession at the grave, there appeared upon the side of the grave, which had previously been opened by a grave-digger in the employ of the corporation, two small coffins, one of which bore the name of John McDonald. The plaintiff testified that no John McDonald had ever been buried in his grave with his consent, and offered testimony tending to show that this body of John McDonald, and the coffin containing the same, had been negligently buried by the employés of the corporation in his grave. Among other testimony thus put in by the plaintiff, he offered evidence to show that at the time of the burial of his wife there were in the possession of the defendant no books of record which would enable its officers, independently of an actual examination of the grave, or a search through the day book of daily interments since the purchase of the grave, to determine, in all cases, without considerable delay, who might be buried in any specified single grave, and that there were not at the time of the burial of the plaintiff's wife any regulations or orders of the corporation requiring or directing the keeping of such records. The defendant contended, and offered testimony to show, that the coffin and body of John McDonald had never been buried in the plaintiff's grave, or, if so buried, such burial was not made by any person for whom the defendant was responsible. No claim was made or evidence offered by the plaintiff that there was any negligence in the employment or selection by the corporation of the gravedigger above referred to, or any of its servants or employés. There was evidence tending to show that some sixty thousand bodies were buried in the cemetery of the defendant at the time of the trial; and it also appeared that the agent or superintendent of the corporation who had charge of the cemetery received a salary of $300 per annum, and that the gravediggers, who were employed by him, also received pay for their services from the corporation. It also appeared that when a grave had been sold, and the same was subsequently opened, at the request of the owner, for the purpose of a fresh interment, a charge of three dollars was made by the corporation for such opening, which sum, however, was devoted, with the other receipts of the corporation, to carrying out the general purposes of the corporation, as above stated."

Commenting upon this state of facts, which we have set forth in detail, that it may be seen that the question involved in the case at bar was presented to the Massachusetts court in as favorable a light as possible, the court say:

"There was evidence warranting a verdict for the plaintiff, if the defendant was subject to the ordinary rules of liability. We are of opinion that

it was subject to those rules, and that, by the terms of the report, judgment must be entered for the plaintiff.   McDonald v. Hospital, 120 Mass. 432, was decided on the ground that the defendant was a public charitable institution, under the laws of the commonwealth; and Benton v. Trustees, 140 Mass. 13, 1 N. E. 836, on the ground that, if it was not within the former decision, then the defendant was a mere agent to perform a duty which the city of Boston had assumed solely for the benefit of the public, under the authority of a statute; that the city of Boston would not be liable, under the rules peculiar to municipal corporations, stated in Tindley v. City of Salem, 137 Mass. 171, and Hill v. City of Boston, 122 Mass. 344; and that, therefore, a mere statutory agent, without property, intervening between the city and the actual wrongdoer, was also free from liability.   The latter ground has no application here.   There is no pretense that the defendant is acting as an agent for the city.   We think that there is equally little ground for calling it a charitable corporation.   Assuming, for the sake of argument, that it would have no right to declare dividends to its members in case of realizing profits, there is nothing in the charter which compels the application of any part of its funds to charitable uses.   It would be acting strictly within its powers if it sold all its lands for full price.   The purpose of the charter is to secure permanent care of graves, and such advantages to the persons interested as may be deemed incident to burial in such a cemetery.   The beneficiaries are a definite number of persons, clearly pointed out by law.   St. 1841, c. 114, §§ 4, 5;  Society v. Crocker, 119 Mass. 1, 23.   See Association v. Beecher, 53 Conn. 551, 5 Atl. 353; In re Deansville Cemetery Ass'n, 66 N. Y. 569.   The provision in St. 1841, c. 114, § 3, that all the real and personal estate of the corporation 'shall be applied exclusively to purposes connected with, and appropriate to, the objects of such organization,' does not mean to exempt its property, and thus the corporation, from ordinary civil liabilities.   There is a similar restriction, express or implied, in the case of a railroad.   The fact that the funds received were actually applied, to a considerable extent, in charity, is no more material than evidence of a similar application of a part of his income by a private citizen would be, in a suit against him."

While it is true that in this state the legislature has provided that the real estate of cemetery associations cannot be reached by a judgment during the time that such real estate is actually in use for burial purposes, it is clear that it was never intended to exempt them from "ordinary civil liabilities," for it is provided (Laws 1879, c. 310, § 2) that:

"Whenever any such land shall cease to be used for cemetery purposes, any judgment, tax, or assessment which, but for the provisions of this act, would have been levied, collected, or imposed, shall thereupon forthwith, together with interest thereon, become and be a lien and charge upon such land, and collectible out of the same."

In the case at bar the neglect was not that of an agent or employé. It was the neglect of the corporation,—the neglect of an implied duty which the corporation owed to those whom it invited within its inclosure; and a notice to its agent that poison ivy was within the inclosure was notice to the corporation, and it was bound to take steps to remove the menace to the safety of those who entered its grounds for a lawful purpose.   The plaintiff in this action having suffered by reason of this neglect, which fact has been found by the jury, although the evidence was not, perhaps, as conclusive as might be desired, she is clearly entitled to damages; and we find no reason for making any change in the judgment which has been rendered.   The statute under which the defendant is organized allows the corporation to make use of its funds for the incidental expenses of the corporation, and there is no doubt that it will feel that it is justified in paying the ex-

penses of this action out of its treasury. There is equally good justification for paying the judgment. It is incident to the conduct of the cemetery. And, if those who have entered this corporation for the purpose of minimizing the cost of burials want to be spared this extra expense, they have the remedy in their own hands. They can select trustees, officers, agents, servants, and employés who will take care that persons lawfully within the grounds are not menaced with dangers which a reasonable degree of care would obviate. Failing to do this, they will not be allowed to escape their obligations by the pretense that they are conducting a public charitable institution. The judgment of the trial court, and the order denying a new trial, should be affirmed, with costs.

HATCH, J., concurs.

GOODRICH, P. J. I do not find myself in accord with the views expressed by Mr. Justice WOODWARD. The first subject to be decided is the relation of the parties to each other, and the liability springing therefrom. There is no deed of the burial plot set out in the record. The plaintiff testified:

"My husband was buried in 1891 in the public ground. I purchased the grave there." "I never paid the cemetery anything for taking care of the grave. I paid a dollar for sodding the grave, and a dollar for sodding my daughter's, also."

During the examination of the plaintiff, the court asked the defendant's counsel:

"What is your claim,—that they [the grave owners] had to take care of their graves?"

And the counsel answered:

"That they had to at that part of the cemetery." "Q. (by plaintiff's counsel). Were any weeds growing about the grave, from the grave, or around about, that extended to your grave? (Objected to as immaterial and irrelevant. Objection overruled, and exception.) A. It was weeds all over. The Court: That does not answer the question. Strike it out. He is asking you whether anything growing on other graves extended over this grave of your husband. (Objected to. Objection overruled, and exception.) A. Yes, sir; * * * I saw shrubs, vines, and other kinds of foliage growing about the other graves, which extended to my grave. * * * They were growing on my grave, and I brushed them aside for the purpose of planting my own plants."

Mr. Butt, the superintendent of the cemetery, testified:

"It [plaintiff's lot] is located in the part of the cemetery known as 'Locust Grove.' It is in the public ground. Some people buy single graves there, for which they pay the sum of twelve dollars. * * * The cemetery does not own the soil. The purchaser buys the graves, out and out, and they have jurisdiction themselves over the grave. They buy about 7x2 or 2½, and about 6 feet in depth. We give them a receipt for the purchase of the grave. * * * In the case of Mrs. George, there was no agreement about compensation for the caring and maintenance of the grave on the part of the cemetery. By the Court: Q. Don't you do anything about caring for these grounds at all,—your cemetery association? A. Yes, sir; on the public ground we mow these twice a season, as the occasion requires. We mow the whole ground all over, including the ground between the graves, and clean it all up. That is all we do, unless we are paid specially to take care of an individual grave. There are some lot owners that hire us to look after particular graves in that special way, for which they have to pay the cemetery."

The plaintiff, being recalled, testified:

"I never had any conversation with Mr. Butt, the witness for the defendant, about the care of the lot.   I never paid him any money.   I gave a dollar for having the grave sodded."

The "ticket of interment" and the "receipt," which were offered in evidence, afford no light on the subject, except that the latter contains the following: "Cemetery charges, $12.00," and, "Received payment.   J. T. Rencie, Q. for Superintendent."

At the close of the plaintiff's case the defendant moved for a non-suit, and renewed the motion at the close of the whole evidence, on the ground, among others, that it appeared "that the defendant had not agreed to take any charge or care of the grave.   All that it did was to sod it.   So that it was no fault on the part of the defendant if poison ivy was growing there."   The motion was denied, and the defendant excepted.   The defendant asked the court to charge "that there is no evidence tending to show any fault or neglect on the part of the defendant," and the court said, "That I decline to charge, and leave it for the jury to determine, as a question of fact, whether there is or not."   Thus, the question is fairly presented to us:   What is the duty of a cemetery association, to persons whose dead are buried in its grounds, and who have purchased either a burial lot or a right of interment, in respect to keeping out dangerous plants of wild growth from the surface of the graves?   The liability, if any, must arise out of negligence in performing some duty which the defendant owed to the plaintiff.   There is in the case at bar no duty arising out of any express covenant.   Defendant's liability can only be derived from proof that the defendant neglected some duty to the plaintiff as a "proprietor" (so called in one of the exhibits).   But I am wholly unable to find any authority, by statute or at common law, imposing on the defendant the duty of exterminating all dele-terious vegetable growths from its inclosure.   It may surely be stated that there is no duty resulting from any contract, other than such as may be implied by the selling of a right to burial or to a burial plot in any cemetery.   There is no covenant to keep the plot in order, and I cannot see any duty on the part of the defendant to keep out of it all deleterious natural growths.   Indeed, the evidence expressly shows that the defendant undertook no such duty.   The fact that it mowed the grass twice a year cannot be deemed to impose upon it the further duty of keeping out poisonous vegetable growths. It is true that the plaintiff was not a trespasser, but was of right upon the premises.   It may be conceded that she was not a "mere licensee," but was an "invited person," to whom the owner of land clearly owes a greater duty than to a mere licensee.   The United States supreme court, in the leading case of Bennett v. Railroad Co., 102 U. S. 577, adopts the statement of Mr. Cooley (sections 604–607 of his admirable work on Torts), where he says that when one, "expressly or by implication, invites others to come upon his premises, whether for business or for any other purpose, it is his duty to be reasonably sure that he is not inviting them into danger; and, to that end, he must exercise ordinary care and prudence to render the premises rea-sonably safe for the visit."   In this case the defendant had left open

hatch holes, into one of which the plaintiff, a passenger going to a train of the defendant, fell, and received injuries, for which, on demurrer, the court held the defendant responsible, as the "demurrer concedes that the company was well aware as well of the condition of the hatch holes on the depot floor as that such condition was unsafe and dangerous to the traveling public." But in the case at bar there is no evidence that the defendant either knew of the existence of the poison ivy at or upon the grave in question, or was under any contract duty to remove it, nor any evidence of any failure to use ordinary care in the maintenance of its grounds. It may even be conceded that, if there had been evidence that the defendant had notice of the presence of the ivy at the grave, it was bound to take measures for its removal, but there is no such evidence. There is evidence that another person was poisoned by ivy upon some other grave in the cemetery four years before the present case, but there is no evidence that this fact was brought home to the plaintiff. In this connection it may not be undesirable to notice the fact that in the cases cited by Mr. Justice WOODWARD (Crowhurst v. Burial Board, 4 Exch. Div. 5; Fletcher v. Rylands, L. R. 1 Exch. 279; Wilson v. Newberry, L. R. 7 Q. B. 31) the acts complained of were, in a sense, acts of commission, as the planting of yew trees, and not negligent omission of some duty. We may, by way of analogy, also resort to the liability of a landlord to a tenant, which was the subject of investigation in Sutton v. Temple, 12 Mees. & W. 52, where the defendant "took the eatage of a field" from the plaintiff, called in the written memorandum "twenty-four acres of eddish," at a stipulated rent. The defendant turned in his cattle to feed, and several died from poison from a heap of manure which lay open in the field, and in which were large quantities of refuse paint. There were found, also, scattered all over the land, minute particles of old paint, which had been spread with the manure before the lease. The defendant surrendered the premises, and refused to pay the rent, and the action was commenced for its recovery, but she was held liable. Lord Abinger, C. B., of the court of exchequer, said:

"The action is brought for the fulfillment of a certain contract applicable to land, viz. for the eddish or eatage of a field (that is, the use of the herbage, to be eaten by cattle) for a certain time. * * * It is not suggested that the plaintiff [the landlord] had the least knowledge of the cause of this injury when she let the land. Now, it is said that there was, under these circumstances, an implied warranty on the part of the plaintiff that the eatage was wholesome food for the cattle. But I take the rule of law to be that if a person contract for the use and occupation of land for a specified time, and at a specified rent, he is bound by that bargain, even though he took it for a particular purpose, and that purpose be not attained."

In the same volume (page 68) is the case of Hart v. Windsor, where it was also held that there is no implied warranty, on a lease of a house or of land, that it is or shall be reasonably fit for habitation, occupation, or cultivation, and that there is no contract (still less, a condition implied by law), on the demise of real property only, that it is fit for the purpose for which it is let. If the defendant had "set a snare," as the court of appeals said in Beck v. Carter, 68 N. Y. 283, or if the defendant had set up a dangerous instrument, like a

spring gun or a mantrap, it would undoubtedly be liable for damages resulting to a person lawfully on the ground; but this is very different from holding the defendant bound to keep the premises free from a natural vegetable growth, which is common over the whole country, and does not injuriously and alike affect all persons. The evidence shows that some are injured by it, and some are not. There is no evidence in the record of any general knowledge of the dangerous character of poison ivy, and I do not think we should resort to citations from scientific books to assist us in holding the defendant liable for the plaintiff's injuries, when the evidence shows that it is not uniformly dangerous to all persons who come in contact with it. Inasmuch, however, as Mr. Justice WOODWARD has referred to such publications, it may not be amiss to say that I find good scientific authority as to the fact that poison ivy is not uniformly injurious. Appleton's Encyclopædia says, "The juice and effluvium from the plant exert a poisonous influence, to which many persons are extremely sensitive, while others are not at all affected, even by chewing the plant." The Century Dictionary says, "It poisons many persons, either by contact or by its effluvium, causing a serious cutaneous eruption, with intense smarting and itching." According to these authorities, not all persons are injuriously affected by the plant; but, in order to affirm this judgment, we must be prepared to hold that the defendant was under obligation to remove and eradicate a natural vegetable growth, common to all parts of the country, and which, as the evidence shows without contradiction, can be destroyed only with the greatest difficulty, is of rapid growth, —and not dangerous to all persons, but only to such as have some idiosyncracy which renders them peculiarly liable to its deleterious influence. If the defendant was bound to this duty, I cannot see why a similar duty does not attach to the public authorities in their control of a public place or highway. Can it be said that they are bound to destroy poison ivy which has crept into the fences or walls over all portions of the public domain, lest, perchance, some passer-by shall touch the ivy and receive injury? I cannot feel called upon to extend the doctrine of negligence to the length which an affirmance of this judgment requires. It would certainly be a new growth upon the accepted doctrine of negligence, quite as dangerous as the plant under consideration. I prefer that the court of final resort shall assume a responsibility so grave and far-reaching in its results. Neither can it be said that the defendant is liable as for the maintenance of a nuisance. Cooley, Torts, § 607, cited in Bennett v. Railroad Co., supra, under the chapter on Nuisances, says:

"The liability in any such case must spring from negligence; and therefore if the injury arises from some danger not known to the owner, and not open to observation, he is not responsible, because he is not in fault."

And section 611:

"A party who comes into possession of lands, as grantee or lessee, with a nuisance already existing upon it [sic], is not, in general, liable for the continuance of the nuisance, until his attention has been called to it, and he has been requested to abate it. This rule is very reasonable. The purchaser of property might be subjected to very great injustice if he were made respon-

sible for consequences of which he was ignorant, and for damages which he never intended to occasion.' "

There is no evidence of any such notice to, or knowledge on the part of, the defendant; and, if the condition of the premises made it a nuisance, that condition should have been proved to have been brought to the knowledge of the defendant, or evidence given sufficient to amount to constructive notice, before any recovery can be had in this action. On the contrary, the superintendent of the cemetery testified that neither he nor the defendant corporation had any notice or knowledge that there was any poison ivy on the grave in question; while the evidence shows that the plant spreads very rapidly. And it may be observed that as soon as this action was commenced, which was on October 2d, he made a careful examination, and found the grave clear of the plant. The evidence, moreover, is not satisfactory to my mind that the plaintiff's injuries resulted, to the extent sworn to, from poison ivy on the defendant's premises. The plaintiff and her physician are at variance as to their evidence on the subject of his attendance and other matters, and I have very serious doubts whether the verdict ought not to be set aside as against the weight of evidence.

Judgment and order reversed, and new trial granted; costs to abide the event.